# 25-3151

## United States Court of Appeals for the Second Circuit

MASSAPEQUA UNION FREE SCHOOL DISTRICT, MASSAPEQUA UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION,

*Plaintiffs-Appellants*,

JEANINE CARAMORE, in her capacity as a Resident/Parent of the School Community,

*Plaintiff*,

v.

NEW YORK STATE BOARD OF REGENTS,

*Defendants-Appellees*.

*(caption continues inside front cover)*

On Appeal from the United States District Court for the Eastern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
STEPHEN J. YANNI
*Assistant Solicitor General*
*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6184

Dated: May 13, 2026

(*caption continued from front cover*)

NEW YORK STATE BOARD OF REGENTS, LESTER W. YOUNG, JR., in his official capacity as Chancellor of the New York State Board of Regents, ROGER TILLES, in his official capacity as a member of the New York State Board of Regents, CHRISTINE D. CEA, in her official capacity as a member of the New York State Board of Regents, WADE S. NORWOOD, in his official capacity as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as Vice Chancellor of the New York State Board of Regents, SUSAN W. MITTLER, in her official capacity as a member of the New York State Board of Regents, FRANCES G. WILLS, in her official capacity as a member of the New York State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents, HASONI L. PRATTS, in her official capacity as a member of the New York State Board of Regents, PATRICK A. MANNION, in his official capacity as a member of the New York State Board of Regents, SEEMA RIVERA, in her official capacity as a member of the New York State Board of Regents, BRIAN KRIST, in his official capacity as a member of the New York State Board of Regents, KEITH B. WILEY, in his official capacity as a member of the New York State Board of Regents, FELICIA THOMAS-WILLIAMS, in her official capacity as a member of the New York State Board of Regents,

*Defendants-Appellees*.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iv

PRELIMINARY STATEMENT .......... 1

ISSUES PRESENTED .......... 3

STATEMENT OF THE CASE .......... 4

A. New York State Education Department's Regulations Prohibiting the Use of Indigenous Names, Logos, and Symbols as Mascots .......... 4

B. Massapequa Union Free School District's Use of an Indigenous Name and Logo .......... 10

C. The Dismissal of Massapequa's Lawsuit Challenging Part 123 .......... 12

D. Massapequa's Agreement with Native American Guardian's Association (NAGA) .......... 14

E. The Denial of Massapequa's Motion to File a Second Amended Complaint .......... 16

F. The Denial of Massapequa's Motion for Reconsideration .......... 21

STANDARD OF REVIEW .......... 22

SUMMARY OF ARGUMENT .......... 23

ARGUMENT .......... 28

POINT I

THE DISTRICT COURT CORRECTLY RULED THAT MASSAPEQUA LACKS STANDING .......... 29

**Page**

A. Massapequa Failed to Plausibly Allege Standing Based on a Hypothetical Title VI Enforcement Action. .................... 30

B. Massapequa Failed to Plausibly Allege Standing Based on Its Illusory Agreement with NAGA. ................................. 37

C. Massapequa Failed to Plausibly Allege Standing Based on Any Other Purported Injury. ........................................... 43

POINT II

THIS COURT MAY AFFIRM ON THE ALTERNATE GROUND THAT MASSAPEQUA LACKS CAPACITY TO CHALLENGE PART 123 .................... 46

A. The District Court Correctly Ruled That Massapequa Lacks Capacity to Assert First Amendment Claims Against the State. ..................................................... 48

B. Massapequa Lacks Capacity to Assert Its Other Statutory and Constitutional Claims. ......................... 51

POINT III

THIS COURT MAY AFFIRM ON THE ALTERNATE GROUND THAT THE PROPOSED COMPLAINT FAILS TO STATE A CLAIM ........................... 54

A. The Proposed Complaint Fails to State a Title VI Claim. ..... 54

1. Massapequa lacks a private right of action under Title VI. ..................................................... 55

2. Massapequa fails to plausibly allege that Part 123 conflicts with Title VI. ..................................... 56

B. The Proposed Complaint Fails to State a 42 U.S.C. § 1981 Claim. ....................................................... 61

**Page**

C. The Proposed Complaint Fails to State a Dormant Commerce Clause Claim. .......... 63

D. The Proposed Complaint Fails to State an Indian Commerce Clause Claim. .......... 64

CONCLUSION .......... 66

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alaska v. U.S. Dep't of Transp.*,
868 F.2d 441 (D.C. Cir. 1989) .......... 33

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 55

*American Psych. Ass'n v. Anthem Health Plans, Inc.*,
821 F.3d 352 (2d Cir. 2016) .......... 55

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 56

*Beijing Neu Cloud Oriental Sys. Tech. Co. v. International Bus. Machs. Corp.*,
110 F.4th 106 (2d Cir. 2024) .......... 46

*Blakeman v. James*,
No. 24-cv-1655, 2024 WL 3201671 (E.D.N.Y. Apr. 4, 2024) .......... 48

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) .......... 57

*Brokamp v. James*,
66 F.4th 374 (2d Cir. 2023) .......... 46

*Brown v. City of Oneonta*,
221 F.3d 329 (2d Cir. 2000) .......... 61-62

*Cayuga Nation v. Tanner*,
824 F.3d 321 (2d Cir. 2016) .......... 30

*Chiapparelli v. Baker, Kellogg & Co.*,
252 N.Y. 192 (1929) .......... 39

*City of New York v. New York*,
86 N.Y.2d 286 (1995) .......... 46-47

**Cases** **Page(s)**

*Clarke v. Town of Newburgh*,
No. 84, 2025 WL 3235042 (N.Y. Nov. 20, 2025) ............................ 48-52

*Comer v. Cisneros*,
37 F.3d 775 (2d Cir. 1994) ............................................................... 29

*Commack Self-Serv. Kosher Meats, Inc. v. Hooker*,
680 F.3d 194 (2d Cir. 2012) ............................................................... 53

*Davis v. FEC*,
554 U.S. 724 (2008) ............................................................................ 29

*DeKalb Cnty. Sch. Dist. v. Schrenko*,
109 F.3d 680 (11th Cir. 1997) ............................................................ 55

*Doe v. Hochul*,
139 F.4th 165 (2d Cir. 2025) .............................................................. 42

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) ............................................................................ 61

*Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*,
118 F.4th 505 (2d Cir. 2024) .............................................................. 31

*Even Street Prods., Ltd. v. Shkat Arrow Hafer & Weber, LLP*,
643 F. Supp. 2d 317 (S.D.N.Y. 2008) ................................................. 42

*Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.*,
11 F.4th 68 (2d Cir. 2021) .................................................................. 45

*Fair Emp. Counsel of Greater Wash., Inc. v. BMC Mktg. Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) ............................................................ 37

*Farrell v. Burke*,
449 F.3d 470 (2d Cir. 2006) ............................................................... 48

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) ....................................................................... 29, 37

**Cases** **Page(s)**


*Female Athletes United v. Ellison*,
172 F.4th 1019 (8th Cir. 2026) .......................................................... 34

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)................................................................................ 49

*General Motors Corp. v. Tracy*,
519 U.S. 278 (1997)................................................................................ 64

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
425 F.3d 158 (2d Cir. 2005) .................................................................. 65

*Gross v. Rell*,
585 F.3d 72 (2d Cir. 2009) .................................................................... 45

*Hamer v. Sidway*,
124 N.Y. 538 (1891) ............................................................................... 40

*Hedges v. Obama*,
724 F.3d 170 (2d Cir. 2013) .................................................................. 32

*Idaho Potato Comm'n v. M & M Produce Farm & Sales*,
335 F.3d 130 (2d Cir. 2003) .................................................................. 40

*In re Methyl Tertiary Butyl (MTBE) Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) .................................................................... 56

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
846 F.3d 58 (2d Cir. 2017) ............................................................ 48, 52

*Kearns v. Cuomo*,
981 F.3d 200 (2d Cir. 2020) .................................................................. 30

*Keepers, Inc. v. City of Milford*,
807 F.3d 24 (2d Cir. 2015) ............................................................ 35, 44

*Kowalski v. Tesmer*,
543 U.S. 125 (2004)................................................................................ 36

**Cases** **Page(s)**

*Lacewell v. Office of Comptroller of Currency*,
999 F.3d 130 (2d Cir. 2021) .......... 43

*Legg v. Ulster Cnty.*,
820 F.3d 67 (2d Cir. 2016) .......... 22

*Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*,
28 N.Y.3d 675 (2017) .......... 37

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 34

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 29

*Manufacturers Tr. Co. v. Kennedy*,
291 F.2d 460 (2d Cir. 1961) .......... 38, 40

*Matter of Cambridge Cent. Sch. Dist. v. New York State Educ. Dep't*,
Index No. 902161-22 (Sup. Ct. Albany Cnty. June 22, 2022) .......... 6

*Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
30 N.Y.3d 377 (2017) .......... 46, 52

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) .......... 32

*Metzler Inv. GmbH v. Chipotle Mexican Grill, Inc.*,
970 F.3d 133 (2d Cir. 2020) .......... 33

*MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*,
861 F.3d 40 (2d Cir. 2017) .......... 44

*Morton v. Mancari*,
417 U.S. 535 (1974) .......... 36, 60, 62

**Cases** **Page(s)**

*Murray v. Northrop Grumman Info. Tech., Inc.*,
444 F.3d 169 (2d Cir. 2006) .......... 38

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 42

*NAACP v. North Hudson Reg'l Fire & Rescue*,
665 F.3d 464 (3d Cir. 2011) .......... 31

*Nassau Supply Co. v. Ice Serv. Co.*,
252 N.Y. 277 (1929) .......... 40

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .......... 63

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*,
766 F.2d 228 (6th Cir. 1985) .......... 33

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*,
769 F.3d 105 (2d Cir. 2014) .......... 64-65

*Patterson v. County of Oneida*,
375 F.3d 206 (2d Cir. 2004) .......... 61

*Pyke v. Cuomo*,
567 F.3d 74 (2d Cir. 2009) .......... 57

*Ripple Analytics Inc. v. People Ctr., Inc.*,
153 F.4th 263 (2d Cir. 2025) .......... 28

*Selevan v. New York Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009) .......... 63

*Smith v. Hogan*,
794 F.3d 249 (2d Cir. 2015) .......... 22

**Cases** **Page(s)**

*Spirit Lake Tribe of Indians ex rel. Comm. of Understanding & Respect v. NCAA*,
715 F.3d 1089 (8th Cir. 2013) .......... 62

*Stanley v. Darlington Cnty. Sch. Dist.*,
84 F.3d 707 (4th Cir. 1996) .......... 56

*Stubbs v. Smith*,
533 F.2d 64 (2d Cir. 1976) .......... 53

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .......... 58

*Tolbert v. Queens Coll.*,
242 F.3d 58 (2d Cir. 2001) .......... 57

*Tripathy v. McKoy*,
103 F.4th 106 (2d Cir.) .......... 28

*Tweed-New Haven Airport Authority v. Tong*,
930 F.3d 65 (2d Cir. 2019) .......... 31-32, 51

*United States v. Alabama*,
791 F.2d 1450 (11th Cir. 1986) .......... 55

*United States v. Williams*,
553 U.S. 285 (2008) .......... 49

*United States v. Young*,
998 F.3d 43 (2d Cir. 2021) .......... 53

*Upstate Citizens for Equal., Inc. v. United States*,
841 F.3d 556 (2d Cir. 2016) .......... 44

*Vermont Mobile Home Owners' Ass'n v. Lapierre*,
94 F. Supp. 2d 519 (D. Vt. 2000) .......... 45

**Cases** **Page(s)**

*Weiner v. McGraw-Hill, Inc.*,
57 N.Y.2d 458 (1982) .......... 40

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) .......... 45

*Zerilli-Edelglass v. New York City Transit Auth.*,
333 F.3d 74 (2d Cir. 2003) .......... 33

**Constitutions**

N.Y. Const. art. XI, § 1 .......... 4

U.S. Const. art. I, § 8, cl. 3 .......... 64

**Federal Statutes**

42 U.S.C. § 2000d .......... 30, 36, 57

**Statutes**

Cal. Educ. Code § 221.3 .......... 9

Colo. Rev. Stat. Ann. § 22-1-133 .......... 9

Conn. Gen. Stat. Ann. § 3-55j .......... 9

Me. Rev. Stat. Ann. tit. 20-A, § 12 .......... 9

Minn. Stat. § 121A.041 .......... 9

N.Y. Education Law
§ 11 .......... 6, 58
§ 12 .......... 6
§ 101 .......... 4
§ 207 .......... 4
§ 305 .......... 4
§ 309 .......... 4

**Statutes** **Page(s)**

Nev. Rev. Stat. Ann. § 388.045 .......... 9

Vt. Stat. Ann. tit. 16, § 568 .......... 9

Wash. Rev. Code Ann. § 28A.320.296 .......... 9

**Regulations**

8 N.Y.C.R.R.
§ 123.1 .......... 7-8
§ 123.1 et seq. .......... 1
§§ 123.1-123.2 .......... 57, 59
§§ 123.1-123.5 .......... 7
§ 123.2 .......... 7, 41, 59, 65
§ 123.3 .......... 8
§ 123.4 .......... 8, 59, 63, 65
§ 123.5 .......... 8, 49, 59-60

**Rule**

Fed. R. Civ. P. 17 .......... 52

**Miscellaneous Authorities**

Mem. from J. Baldwin, Senior Deputy Comm'r, NYSED to All Sch. Dists. (Nov. 17, 2022), https://www.nysed.gov/sites/default/files/programs/main/indigenous-native-american-mascot-memo.pdf .......... 7

Mem. from R. Mills, Comm'r, NYSED to Presidents of Bds. of Educ. & Superintendents of Pub. Schs. (Apr. 5, 2001), https://www.nysed.gov/sites/default/files/programs/indigenous-education/public-schools-use-of-native-american-names-symbols-and-mascots.pdf .......... 5

Robert Braucher & E. Allan Farnsworth, A.L.I., *Restatement (Second) of Contracts* § 77 (Westlaw Oct. 2024 update) .......... 39

**Miscellaneous Authorities** **Page(s)**

U.S. Dep't of Just., *Title VI Legal Manual*,
2017 WL 1712115 (2017) (Westlaw) .................................................. 56

3 Williston on Contracts § 7:7 (4th ed. Westlaw May 2025) ............ 37-38

## PRELIMINARY STATEMENT

This case concerns New York State Education Department (NYSED) regulations, known as Part 123, requiring public schools within the State to eliminate the use of Indigenous names, logos, or mascots for school sports teams and purposes other than classroom instruction. 8 N.Y.C.R.R. § 123.1 et seq. Plaintiff-appellant Massapequa Union Free School District, which uses the name "Chiefs" and a logo featuring the supposed likeness of a Native American man, challenged Part 123 as unconstitutional.[1] After the district court dismissed Massapequa's complaint based on its lack of capacity to challenge state regulations, Massapequa entered into an illusory agreement with Native American Guardian's Association (NAGA). In the agreement, NAGA purported to "authorize" Massapequa to use the Chiefs name and logo—even though NAGA possesses no legal interest in the name or logo. Massapequa then moved to amend the complaint to add allegations about the agreement and new claims.

---

[1] Plaintiff-appellant Massapequa Union Free School District Board of Education also joined the suit. This brief refers to the school district and school board together as "Massapequa."

The U.S. District Court for the Eastern District of New York (Bulsara, J.) denied Massapequa's motion for leave to amend as futile based on lack of standing and capacity. The court denied Massapequa's subsequent motion for reconsideration. This Court should affirm.

First, Massapequa lacks standing to pursue its proposed claims. Massapequa fails to plausibly allege that it faces a credible risk that the federal government will seek to enforce Title VI against Massapequa if it complies unwillingly with Part 123. The recent findings of the U.S. Department of Education's Office of Civil Rights about a differently situated school district that *voluntarily* complied with Part 123 are inapposite and postdate the district court's decision. Nor does Massapequa plausibly allege standing based on its illusory agreement with NAGA or any other source. Because the agreement contains only illusory promises, it is not a valid contract and its alleged impairment does not give rise to any cognizable injury in fact.

Second, and alternatively, Massapequa lacks capacity to challenge Part 123. New York law provides that municipal corporations, including school districts, lack capacity to challenge the legality of state statutes and regulations. Contrary to Massapequa's argument, it does not qualify for a narrow exception to the capacity bar that allows a municipal corporation

to challenge a state law where compliance with that law would require violating a constitutional proscription. Massapequa fails to plausibly allege that complying with Part 123 would require it to violate the First Amendment. And there is no exception to the capacity bar that would allow Massapequa to assert its remaining preemption claims.

Third, even if this Court were to conclude that Massapequa established standing and capacity, the judgment below should be affirmed on the independent and alternative ground that the proposed complaint fails to state a claim on which relief can be granted. Each proposed claim suffers from fundamental pleading deficiencies.

## ISSUES PRESENTED

1. Whether the district court correctly denied Massapequa leave to amend its complaint on futility grounds because Massapequa lacks standing to assert its proposed claims.

2. Whether the district court's judgment can be affirmed on the independent and alternative ground that Massapequa lacks capacity to assert its proposed claims.

3. Whether the district court's judgment can be affirmed on the independent and alternative ground that Massapequa's proposed amended complaint fails to state a claim.

## STATEMENT OF THE CASE

### A. New York State Education Department's Regulations Prohibiting the Use of Indigenous Names, Logos, and Symbols as Mascots

The New York State Constitution directs the Legislature to "provide for the maintenance and support of a system of free common schools" to educate the State's children. N.Y. Const. art. XI, § 1. The Legislature has empowered the Board of Regents, through NYSED, to "establish rules for carrying into effect the laws and policies of the state, relating to education." N.Y. Educ. Law § 207; *see id.* § 101. The Commissioner of Education "is the chief executive officer of the state system of education and of the board of regents." *Id.* § 305(1). School districts are "subject to the visitation of the commissioner," who exercises "general supervision of their boards of education and their management and conduct of all departments of instruction." *Id.* § 309; *see id.* § 305(2).

In 2001, the Commissioner issued a memorandum calling upon public school administrators in New York to discontinue the use of Native

American names and symbols as mascots. (Joint Appendix (J.A.) 147.) After carefully considering competing interests, the Commissioner "concluded that the use of Native American symbols or depictions as mascots can become a barrier to building a safe and nurturing school community and improving academic achievement for all students."[2] That determination was based on extensive research and discussion and followed the elimination of Native American mascots at more than 600 secondary and postsecondary schools across the country over the preceding thirty years.[3] Around the same time, the U.S. Commission on Civil Rights similarly encouraged schools to bring an "end to the use of Native American images and team names." (J.A. 312.)

After the Commissioner's 2001 memorandum, many school districts in the State retired their Indigenous names, logos, and mascots, but others did not. (J.A. 263.) In 2021, Cambridge Central School District in upstate New York reinstated its Indigenous team name and logo after having previ-

---

[2] Mem. from R. Mills, Comm'r, NYSED to Presidents of Bds. of Educ. & Superintendents of Pub. Schs. 1 (Apr. 5, 2001), www.nysed.gov/sites/default/files/programs/indigenous-education/public-schools-use-of-native-american-names-symbols-and-mascots.pdf. All websites were last visited May 13, 2026.

[3] *Id.* at 1-2.

ously retired them. (J.A. 263.) The Commissioner sustained a challenge to that decision, finding that Cambridge had not sufficiently explained its change in position. (J.A. 285-286.) The Commissioner also concluded that Cambridge's continued use of the Indigenous name and logo ran counter to the prevailing professional opinion that the use of Indigenous mascots, symbols, and imagery negatively affects both Indigenous and non-Indigenous students by reinforcing stereotyping and prejudices. (J.A. 286-287.) In addition, the Commissioner observed that Cambridge's actions risked violating New York's Dignity for All Students Act, which prohibits "the creation of a hostile environment . . . that reasonably causes or would reasonably be expected to cause . . . emotional harm to a student," including acts based on a person's actual or perceived race, national origin, or ethnic group, Educ. Law § 11(7); *see id.* § 12. (J.A. 286.) In June 2022, a New York State court upheld the Commissioner's ruling about Cambridge. *Matter of Cambridge Cent. Sch. Dist. v. New York State Educ. Dep't*, Index No. 902161-22 (Sup. Ct. Albany Cnty. June 22, 2022) (reproduced at J.A. 272-280), *appeal dismissed*, 222 A.D.3d 1068 (3d Dep't 2023).

After the state court's ruling in the *Cambridge* case, NYSED issued a memorandum explaining that the court's decision had confirmed, consis-

tent with the Commissioner's 2001 memorandum, that public school districts may not use Native American mascots. [4] (J.A. 147, 264.) The memorandum signaled NYSED's intent to promulgate regulations to that end. (*See* J.A. 147-148.) In December 2022, NYSED commenced a proposed rulemaking. (J.A. 263.) After a public comment period (*see* J.A. 266-270), the Board of Regents approved Part 123 of the Regulations of the Commissioner of Education, 8 N.Y.C.R.R. §§ 123.1-123.5.

Part 123, which became effective in May 2023, provides that "no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction." 8 N.Y.C.R.R. § 123.2. The regulation defines "Indigenous name, logo, or mascot" to mean "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such school[']s sports teams." *Id.* § 123.1. The definition "does not include a public school, school

---

[4] *See also* Mem. from J. Baldwin, Senior Deputy Comm'r, NYSED to All Sch. Dists. (Nov. 17, 2022), https://www.nysed.gov/sites/default/files/programs/main/indigenous-native-american-mascot-memo.pdf.

building, or school district named after an Indigenous tribe." *Id.* The regulation contains exceptions for the sports teams of tribal nations composed of tribal members, *id.* § 123.4(a), and for any public school that, as of Part 123's effective date, had entered into a written agreement with a federally or state-recognized tribe in New York permitting "the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe," *id.* § 123.4(b). In connection with such agreements, public schools may not "offer or accept any money, consideration, or thing of value." *Id.*

Part 123 also sets forth a timeline for implementation. The regulation requires school boards to have adopted resolutions by the end of the 2022-2023 school year committing to eliminate Indigenous names, logos, and mascots and establishing a plan for doing so by the end of the 2024-2025 school year. *Id.* § 123.3(a). The Commissioner can extend these deadlines for good cause. *Id.* § 123.3(b).

Finally, Part 123 contains a prohibition on the use or promotion of Indigenous names, logos, or mascots by school officers and employees "when located on school property or at a school function." *Id.* § 123.5. That provision contains a limited exception for members of tribal nations. *Id.*

NYSED issued guidance to accompany Part 123 to provide additional background information and address frequently asked questions. For example, the guidance explains the types of names, logos, and mascots covered by Part 123; how school districts can request an extension of the timeline for compliance; and how to contact NYSED with questions concerning Part 123 and its application. (SPA 117-123.)

Numerous other States similarly limit public schools' use of Indigenous names, logos, and mascots. *See, e.g.*, Cal. Educ. Code § 221.3; Colo. Rev. Stat. Ann. § 22-1-133; Conn. Gen. Stat. Ann. § 3-55j(*l*); Me. Rev. Stat. Ann. tit. 20-A, § 12; Minn. Stat. § 121A.041; Nev. Rev. Stat. Ann. § 388.045; Vt. Stat. Ann. tit. 16, § 568; Wash. Rev. Code Ann. § 28A.320.296.

### B. Massapequa Union Free School District's Use of an Indigenous Name and Logo

The hamlet of Massapequa is located in Nassau County and is purportedly named for Native Americans who historically occupied the area. (J.A. 137-138.) Beginning in 1925, the Massapequa Avenue School began using the name "Chiefs" and a logo purporting to depict a Native American man in full headdress. When Massapequa High School opened in 1955, it adopted the same name and logo, which has been used ever since. (J.A. 139-140.)

In June 2023, after Part 123 became effective, Massapequa's board of education "passed a resolution with a plan to eliminate the use of prohibited Indigenous names, mascots, and logos by the end of the 2023-2024 school year." (J.A. 149.) The resolution stated that the board's compliance with Part 123's requirement to approve such a plan should not be construed as a waiver of the district's right to challenge the regulation. (*See* J.A. 149.) Since then, Massapequa has taken no steps to implement the plan to comply with Part 123.[5]

---

[5] In June 2025, days before the plan-implementation deadline, Massapequa requested an extension on the basis that Part 123 is unlawful.

(*continued on the next page*)

Although Massapequa intends to defy Part 123, no school officer or employee currently alleges that they intend to utilize or promote Indigenous names, logos, or mascots on school property or at school functions, in violation of the regulation. School board member Jeanine Caramore previously alleged that she had continued to wear apparel featuring the Chiefs name and logo to school sports games and other school functions to convey her support for the school community and to protest Part 123. (J.A. 160-161.) Caramore also alleged that she had planned to wear apparel bearing the Chiefs name and logo while distributing campaign materials on school property and at school-sponsored events during her next reelection campaign. (J.A. 167.) But Caramore has since voluntarily withdrawn her claims. See *infra* at 20-21.

---

NYSED denied that request. *See* Br. for Pls.-Appellants at 13. Massapequa initiated a separate challenge to the denial of its extension request, which remains pending in state court. *See* Amended Verified Art. 78 Pet., *Massapequa Union Free Sch. Dist. v. Hochul*, No. 909931-25 (N.Y. Sup. Ct. Albany Cnty. Nov. 19, 2025), NYSCEF No. 32.

### C. The Dismissal of Massapequa's Lawsuit Challenging Part 123

In September 2023, Massapequa and Caramore brought suit in the U.S. District Court for the Eastern District of New York. The amended complaint, on behalf of all plaintiffs, asserted that Part 123 is impermissibly overbroad and vague under the First and Fourteenth Amendments and violates other provisions of state and federal law. Caramore in her individual capacity asserted that Part 123 violated her First Amendment right to free speech. Plaintiffs sought declaratory and injunctive relief prohibiting the Board of Regents and its members from enforcing Part 123. (J.A. 21-33.)

In March 2025, the district court (Brodie, J.) granted defendants' motion to dismiss the amended complaint.[6] (J.A. 35-123.) The court determined that Massapequa (plus Caramore in her official capacity) lacked

[6] The dismissal order resolved similar claims in other, related lawsuits brought by Connetquot, Wantagh, and Wyandanch School Districts. (J.A. 39-41.) The Wantagh plaintiffs appealed the dismissal of their claims, and that appeal remains pending in this Court (No. 25-1136). The Connetquot plaintiffs also appealed, but the school district and school board voluntarily withdrew their appeal. *See* Order, *Napolitano-Furno v. New York State Bd. of Regents*, No. 25-1137 (2d Cir. Sept. 24, 2025), ECF No. 33.

capacity to bring a constitutional challenge to Part 123. (J.A. 49-62.) Under New York law, the court explained, municipal corporations generally lack capacity to challenge the constitutionality of state actions. (J.A. 51-56.) And Massapequa failed to establish that it qualified for a narrow exception to the capacity bar applicable when a state law would require a municipal corporation to violate a constitutional proscription. The court determined that Massapequa did not plausibly allege that complying with Part 123 would force it to violate any constitutional proscription but rather broadly alleged that the mere existence of Part 123 "creates an unnecessary risk of chilling the speech and expression of school employees, and the school community at large." (J.A. 60 (quotation marks omitted); *see* J.A. 56-62.)

The district court also concluded that Caramore in her personal capacity failed to state a claim on any of the theories presented in the amended complaint. However, the court granted Caramore leave to replead additional facts supporting her First Amendment claim. (J.A. 122-123.) The court declined to exercise supplemental jurisdiction over any of the plaintiffs' state law claims. (J.A. 46, 105-112.) Massapequa and Caramore filed a notice of appeal from the district court's dismissal order but later

withdrew the appeal without prejudice. Order, *Massapequa Union Free Sch. Dist. v. New York State Bd. of Regents*, No. 25-1135 (2d Cir. July 9, 2025), ECF No. 21.

### D. Massapequa's Agreement with Native American Guardian's Association (NAGA)

In May 2025, shortly after the district court's dismissal order and two years after Part 123's effective date, Massapequa entered into an agreement with NAGA (the "Agreement"). (J.A. 151.) NAGA is a nonprofit organization founded in 2017 and headquartered in North Dakota. (SPA 15.) Its mission includes opposing state restrictions on the use of Native American imagery. (*See* J.A. 151-152.)

The Agreement observes at the outset that Massapequa is subject to Part 123 and thus must "discontinue utilizing the name, image and likeness ('NIL') of a Native American chief as the District's symbol and to discontinue utilizing the name 'Chiefs.'"[7] Compl., Ex. A, Mem. of Agreement at 1 (May 15, 2025), *Native Am. Guardian's Ass'n v. New York State Bd.*

---

[7] The proposed second amended complaint incorporates the Agreement by reference. (*See* J.A. 151-154.) The Agreement was filed as an exhibit to the complaint in the parallel case brought by NAGA. (*See* SPA 16.)

*of Regents*, No. 2:25-cv-03008 (E.D.N.Y. Jan. 27, 2026) ("NAGA Agreement"), ECF No. 1-1. Despite this preexisting state law prohibition, NAGA purports to "permit, consent to, support, and authorize the District's continued use of the Indigenous NIL." *Id.* at 2. But the Agreement does not state—and Massapequa does not allege—that NAGA has any legal right or interest in the Chiefs name and logo, which Massapequa had used for many decades before NAGA was founded. In exchange for this purported "authorization," Massapequa promises to continue using the Chiefs name and logo and to continue its "current educational programming and instruction concerning Native American history and culture." *Id.* Massapequa also agrees to "meet with a NAGA representative . . . at least once per year to review and discuss the educational programming and instruction." *Id.*

The Agreement contains no enforcement mechanism. Instead, the Agreement states that if Massapequa discontinues its educational programming or stops using the Chiefs name and logo, NAGA's "authorization for the District's continued use of its Indigenous NIL rights will automatically be withdrawn." *Id.* And the Agreement further states that "NAGA . . . will have no cause of action of any kind and nature to compel

or require the District to provide any kind of educational programing or instruction." *Id.* In addition, either party may unilaterally terminate the Agreement on thirty days' notice. *Id.*

### E. The Denial of Massapequa's Motion to File a Second Amended Complaint

Days after executing the Agreement with NAGA, Massapequa and Caramore moved for leave to file a second amended complaint to add new factual allegations related to the Agreement and various additional claims.[8] (J.A. 124-125, 188-256.) The plaintiffs proceeded by motion because the district court had previously granted leave to amend only to Caramore in her individual capacity and had not granted leave to amend to Massapequa (or to Caramore in her official capacity). (SPA 4.) The proposed complaint asserted claims under the First Amendment, Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Dormant Commerce Clause, and

---

[8] Shortly after plaintiffs moved for leave to amend, NAGA filed a separate lawsuit in the U.S. District Court for the Eastern District of New York challenging Part 123. (SPA 15.) The district court deemed this case and NAGA's case to be related. (*See* J.A. 604.) In the same memorandum and order resolving plaintiffs' motion for leave to amend in this case, the court granted defendants' motion to dismiss NAGA's complaint. (SPA 90.) NAGA filed an appeal, which remains pending in this Court (No. 25-3221).

the Indian Commerce Clause. The proposed complaint also asserted that Part 123 is an unconstitutional bill of attainder.[9] (J.A. 155-187.) The proposed complaint sought declaratory and injunctive relief against the enforcement of Part 123. (J.A. 187.)

The district court (Bulsara, J.) denied the motion for leave to amend as to Massapequa. As the court explained, Massapequa had largely "recycled their prior allegations almost word for word and added a host of new claims" without explaining how the proposed complaint's allegations supported them. (SPA 4.) The court thus determined that further amendment would be futile.

First, the court determined that Massapequa continued to lack capacity to assert claims under the First Amendment. As the court explained, the proposed complaint contained no new allegations that could plausibly support Massapequa's claim that it would be forced to violate the constitutional rights of school employees or officials—as required to satisfy the constitutional-proscription exception to the capacity bar. (SPA 29-31.) The court concluded that Massapequa had capacity to assert its remain-

[9] The proposed complaint no longer included a Fourteenth Amendment due process claim. (*See* J.A. 220-224.)

ing claims based on federal law holding that municipalities may assert preemption claims against their parent States. (SPA 28, 32.)

Second, the court determined that Massapequa lacked standing to assert all but one of its proposed claims.[10]

*First Amendment*. The court rejected Massapequa's attempt to demonstrate standing by alleging that it will be "forced to chill the speech of others." (SPA 42.) As a preliminary matter, the court noted that courts have questioned whether municipalities can assert First Amendment injuries at all. (SPA 42-43.) In any event, the court concluded, Massapequa's alleged coercion-based injury was "not actual or imminent, but instead conjectural or hypothetical." (SPA 43.) For example, Massapequa did not identify any school employee or official besides Caramore who uses the Chiefs name and logo on campus, and Massapequa did not allege that it planned to stop Caramore from doing so. (SPA 44-45.) Nor did Massapequa plausibly allege an injury based on compliance costs or risk of legal exposure, which the proposed complaint treated in a conclusory manner.

[10] The court dismissed on the merits Massapequa's claim that Part 123 is an unconstitutional bill of attainder. (SPA 87-88, 92.) That claim is not at issue in this appeal.

(SPA 46-47.) Finally, the court determined that Massapequa could not sue to vindicate the rights of its employees (i.e., third parties) based on the alleged restriction of those third parties' political speech. (SPA 48-49.)

*Dormant and Indian Commerce Clauses.* The court next rejected Massapequa's dormant Commerce Clause claim for failure to allege any injury resulting from a burden on interstate commerce. The court also found that Massapequa suffered no injury based on its illusory Agreement with NAGA. (SPA 71-74.) Although NAGA purported to authorize Massapequa to use the Chiefs name and logo, this promise could not serve as valid consideration because NAGA "does not own, license, or have any relationship to the current Chiefs mascot." (SPA 53.) Similarly, "Massapequa's promises to conduct educational programing and to continue to use the Chiefs mascot" were meaningless because they could be discontinued at Massapequa's sole option. (SPA 54.) The court also concluded that Massapequa lacked standing to assert a claim under the Indian Commerce Clause because it had sustained no injury stemming from activities conducted on or affecting tribal lands. (SPA 74-76.)

*Section 1981.* For similar reasons, the court determined that Massapequa did not plausibly allege standing to assert a claim under 42

U.S.C. § 1981. A § 1981 plaintiff must show the impairment of a valid contractual relationship. But Massapequa's claim was premised on the illusory Agreement with NAGA, the court explained, which is not a valid contract. (SPA 86-87.)

*Title VI.* The court determined that Massapequa lacked standing to assert claims under Title VI because its asserted injuries were remote and speculative.[11] Massapequa did not plausibly allege that it risked a federal Title VI enforcement action. Instead, Massapequa alleged that the federal government had directed a Title VI investigation toward NYSED.[12] (SPA 80-81.)

Although the court denied Massapequa's motion for leave to amend as futile, it granted the motion as to Caramore in her individual capacity and allowed her First Amendment challenge to proceed. (SPA 62-63, 91.) Caramore, however, voluntarily dismissed her claims in December 2025.

---

[11] The court dismissed Massapequa's Title VII claim for similar reasons. (*See* SPA 82-85.) That claim is not at issue in this appeal.

[12] In May 2025, OCR issued a press release stating that the Board of Regents "'has violated Title VI . . . by banning the use of Native American mascots and logos by school districts in the state of New York.'" (SPA 80-81 (quoting press release).) No further action has been taken.

(J.A. 423-424.) The district court entered final judgment in defendants' favor on January 15, 2026. (J.A. 428-429.)

## F. The Denial of Massapequa's Motion for Reconsideration

Subsequently, Massapequa moved to amend the judgment under Federal Rules of Civil Procedure 59(e) and 60(b). Massapequa argued that new facts contradicted the court's prior finding that Massapequa had not plausibly alleged it would face a federal Title VI enforcement action. Specifically, the U.S. Department of Education's Office of Civil Rights (OCR) found on January 22, 2026, that Connetquot Central School District had violated Title VI by ending its legal challenge to Part 123 and taking steps to comply with the regulation. (SPA 95-98.)

The district court denied the motion. The court first explained that Massapequa's post-judgment evidence could not be considered under Rules 59 or 60 because it did not exist at the time of the court's order denying leave to amend. (SPA 100, 106.) And while Massapequa's motion further asserted that OCR had been investigating Connetquot Central School District since July 2025, Massapequa had not previously "identified OCR's investigation into Connetquot in the motion to amend briefing." (SPA 99.)

Moreover, the court found, Massapequa's consistent litigation position demonstrated that it was differently situated from Connetquot. In contrast to Connetquot, which voluntarily ended its challenge to Part 123, Massapequa represented that it had "no intent to comply with Part 123 unless forced to by court order," meaning that any future compliance would be unwilling. (*See* SPA 103.) Under these circumstances, the court concluded, Massapequa could not plausibly claim that "*they* are at risk of OCR enforcement activity, having repeatedly suggested facts to the contrary for months." (SPA 104.)

## STANDARD OF REVIEW

This Court reviews the denial of a motion for leave to amend for abuse of discretion but reviews de novo a determination that amendment would be futile. *Smith v. Hogan*, 794 F.3d 249, 253 (2d Cir. 2015). This Court reviews the denial of a motion for reconsideration under Rules 59(e) and 60(b) for abuse of discretion. *Legg v. Ulster Cnty.*, 820 F.3d 67, 78 (2d Cir. 2016).

## SUMMARY OF ARGUMENT

I. The district court correctly denied leave to amend as futile because Massapequa lacks standing to assert its proposed claims.

A. Massapequa fails to plausibly allege that it faces a credible risk of a federal Title VI enforcement action. To the contrary, Massapequa alleges that the federal government will take action against the State. Massapequa further alleges that its hypothetical future compliance with Part 123 would be unwilling and pursuant to court order. OCR's recent findings about a differently situated school district that voluntarily discontinued its legal challenge to Part 123 and voluntarily complied with the regulation are inapposite. In any event, these new allegations postdating the decision denying leave to amend cannot support relief from the judgment under Rules 59 and 60.

Massapequa lacks prudential standing to vindicate the Title VI rights of alleged victims of discrimination based on its status as a regulated entity. And the proposed complaint does not plausibly allege that Massapequa's future enforcement of Part 123 will result in any such discrimination.

B. Massapequa does not plausibly allege standing based on its illusory agreement with NAGA. Under the Agreement, NAGA purports to authorize Massapequa's use of the Chiefs name and logo. Yet NAGA has no rights to the name or logo, which Massapequa had used for many decades before NAGA was founded, making the promise an empty gesture. Similarly, although Massapequa promises in the Agreement to continue using the Chiefs name and logo and to continue providing its current educational programming on Indigenous history, Massapequa's performance under the Agreement is entirely optional. Because the Agreement contains only illusory promises, it is not a valid contract, and its alleged impairment does not give rise to any cognizable injury in fact.

C. Massapequa fails to plausibly allege any other concrete injury. The proposed complaint's allegations about compliance costs are vague, speculative, and largely unrelated to the legal violations alleged. Similarly, it is not plausible that Massapequa will face legal exposure arising from its compliance with Part 123. For example, Massapequa does not plausibly allege that it will be forced to suppress free speech, where the only person who alleged they would engage in protected activity (Caramore) has since withdrawn her claims.

II. Alternatively, this Court may affirm on the ground that Massapequa lacks capacity to assert its proposed claims. Under New York law, municipal corporations lack capacity to challenge the constitutionality of state statutes and regulations. No exception to that rule applies here.

A. Massapequa lacks capacity to assert a First Amendment claim under either of the proposed complaint's two theories. Massapequa erroneously relies on a narrow exception to the capacity bar that applies only where a municipality's compliance with the challenged state law will force it to violate constitutional rights. This constitutional-proscription exception does not apply to Massapequa's overbreadth claim because Massapequa does not allege that its enforcement of Part 123 will force it to violate the First Amendment in a substantial number of Part 123's applications. Massapequa also lacks capacity to assert a claim based on the alleged suppression of political speech absent any current, plausible allegation that a school board candidate intends to use the Chiefs name or logo on school property or at school functions and that Massapequa intends to silence that speech.

B. Massapequa lacks capacity to assert its remaining statutory and constitutional claims, which it frames as preemption challenges under the Supremacy Clause. The New York Court of Appeals has expressly held that state law—which controls here—does not recognize an exception to the capacity bar based on the Supremacy Clause.

III. If this Court determines that Massapequa has both standing and capacity (it does not), the Court should nonetheless affirm because the proposed complaint fails to state a claim.

A. Massapequa fails to state a claim under Title VI for two independent reasons. First, Title VI does not provide municipal corporations such as Massapequa with a private right of action to sue the State. There is no indication that Congress intended that the implied right of action available to victims of discrimination would extend to a school district suing its parent State.

Second, Massapequa does not plausibly allege that Part 123 conflicts with Title VI. Part 123 requires public school districts to eliminate the use of Indigenous names, logos, and mascots in certain contexts—not to discriminate against any person on account of race. And even if Part 123's limitation on the use of Indigenous names, logos, or mascots were construed

to impose a racial classification, it would satisfy strict scrutiny because Part 123 is narrowly tailored to accomplish its goal of eliminating discrimination and stereotyping in public schools. Contrary to Massapequa's assertions, § 123.4 does not bar contracts with Indigenous-affiliated organizations, and § 123.5's exemption for members of tribal nations does not discriminate based on race but rather imposes a political classification.

B. Massapequa fails to state a claim under 42 U.S.C. § 1981. This claim fails at the outset because it requires impairment of a valid contract, but the illusory Agreement is not a valid contract. Nor does Massapequa adequately allege that § 123.4(b)—which governs the terms on which public schools may obtain the consent of a tribal nation to use an Indigenous name, logo, or mascot—implicates the right to contract or discriminates along racial lines.

C. Massapequa fails to state a claim that Part 123 violates the dormant Commerce Clause because there is no plausible allegation that Part 123 implicates a competitive market or favors in-state commercial interests.

D. Massapequa fails to state a claim that Part 123 violates the Indian Commerce Clause because there is no plausible allegation Part 123 implicates activities on Indian lands or affects Indian affairs.

## ARGUMENT

On appeal, Massapequa does not challenge the district court's denial of leave to amend as to its claims under Title VII and the Constitution's prohibition against bills of attainder. Those claims are therefore abandoned. *See Tripathy v. McKoy*, 103 F.4th 106, 118-19 (2d Cir.), *pet. for cert. docketed*, No. 24-229 (U.S. Aug. 29, 2024). The district court correctly concluded that Massapequa lacks standing to assert its remaining claims and, on that basis, properly denied leave to amend as futile. *See Ripple Analytics Inc. v. People Ctr., Inc.*, 153 F.4th 263, 271-72 (2d Cir. 2025). Alternatively, the district court's judgment should be affirmed based on Massapequa's lack of capacity or failure to state a claim.

## POINT I

### THE DISTRICT COURT CORRECTLY RULED THAT MASSAPEQUA LACKS STANDING

To establish article III standing, "a plaintiff must demonstrate (i) that [the plaintiff] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[S]tanding is measured as of the time the suit is brought." *Comer v. Cisneros*, 37 F.3d 775, 791 (2d Cir. 1994). And a plaintiff must demonstrate standing as to each claim asserted and for each form of relief sought. *Davis v. FEC*, 554 U.S. 724, 734 (2008). The district court correctly held that Massapequa lacks standing to pursue any of its claims.

### A. Massapequa Failed to Plausibly Allege Standing Based on a Hypothetical Title VI Enforcement Action.

Title VI prohibits discrimination on the basis of race or national origin "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Massapequa argues that Part 123's requirement that public schools eliminate Indigenous names, logos, and mascots requires it to engage in discrimination and that it will face a federal Title VI enforcement action if forced to comply with the regulation. *See* Br. for Pls.-Appellants (Br.) at 20-25. The district court correctly rejected this theory, which requires demonstrating a fear of enforcement "that is both actual and well-founded." *See Kearns v. Cuomo*, 981 F.3d 200, 207 (2d Cir. 2020) (quotation marks omitted); *see also Cayuga Nation v. Tanner*, 824 F.3d 321, 331-32 (2d Cir. 2016).

Massapequa's allegations and representations throughout this litigation demonstrate that it will *not* be subject to a federal enforcement action. Massapequa has made clear that it will comply with Part 123 only if compelled to do so by a court order declaring Part 123 to be lawful. (*See* SPA 103 (citing correspondence between Massapequa and NYSED).) And there is no indication that the federal government could or would pursue a Title VI enforcement action against Massapequa in that circumstance.

*Cf. NAACP v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 484-85 (3d Cir. 2011) (compliance with judicial mandate did not constitute deliberate discrimination). In the interim, Massapequa faces no risk of federal enforcement while it continues to defy Part 123.

Moreover, Massapequa has repeatedly emphasized that OCR has directed a Title VI investigation at NYSED—not Massapequa. (SPA 80-81; *see* SPA 104.) The proposed complaint contains a social media post by President Trump expressing his support for Massapequa's resistance to Part 123, and a photograph of the President holding a sweatshirt bearing the Chiefs name and logo. (*See* J.A. 162-163.) Under these alleged circumstances, where the federal government has expressly stated its support for Massapequa, it is implausible that Massapequa is at risk of federal enforcement activity. *See Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 519 (2d Cir. 2024) (courts may reject standing based on lack of intent to enforce law against plaintiff).

This Court's decision in *Tweed-New Haven Airport Authority v. Tong*, 930 F.3d 65 (2d Cir. 2019) does not support Massapequa's arguments. *See* Br. at 21-22. In *Tong*, a local airport had secured federal approval to extend a runway to meet federal requirements, and Connecticut then enacted a

statute preventing the airport from extending that specific runway. 930 F.3d at 68-70. The airport challenged the state statute as preempted by the federal regulations. This Court concluded that the airport had standing to challenge the Connecticut statute because the statute directly targeted the airport and its planned runway extension. The airport thus faced a credible risk of state enforcement if it defied the statute by extending the runway. *Id.* at 70.

The current case is fundamentally different. In *Tong*, the challenged state statute specifically targeted the airport, whereas Massapequa has not plausibly alleged that the federal government is specifically targeting Massapequa or has any intention of enforcing Title VI against it.[13] And Massapequa's allegation that it may be compelled to comply with Part 123 by court order does not describe "a course of conduct . . . proscribed by statute."[14] *See Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013) (quotation marks omitted).

---

[13] *MedImmune, Inc. v. Genentech, Inc.* is similarly distinguishable: The plaintiff in that case alleged a clear threat of enforcement if it were to violate its contractual obligations. *See* 549 U.S. 118, 128 (2007).

[14] Massapequa's other cases are inapposite. *See* Br. at 21-22. In each case, federal officials took the position that federal law preempted state

(*continued on the next page*)

Massapequa is wrong to argue that its standing is supported by OCR's unrelated findings about Connetquot Central School District. As a preliminary matter, Massapequa did not raise below the issue of OCR's investigation into Connetquot when it moved for leave to amend—which is why the district court did not address it.[15] (SPA 99.) Massapequa has thus forfeited any argument based on the Connetquot investigation. *See Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003). Nor may Massapequa rely on OCR's later findings about Connetquot as a basis for relief from the judgment. (*See* J.A. 437-438.) As the district court correctly explained (SPA 100, 106), newly discovered evidence must have existed at the time of the dispositive order to provide a basis for relief under Rules 59 or 60. *See Metzler Inv. GmbH v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 146-47 (2d Cir. 2020).

---

law, injuring the States by preventing them from enforcing their own laws. *See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 442-43 (D.C. Cir. 1989); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 229-30, 232-33 (6th Cir. 1985). Here, federal officials *agree* with Massapequa's decision to maintain the Chiefs name and logo.

[15] Massapequa contends that it brought the Connetquot investigation to the district court's attention in a July 2025 letter brief. Br. at 21. But as the court explained, that letter was directed at a different issue and Massapequa did not mention the investigation in its briefing on the motion for leave to amend. (SPA 99.)

In any event, Massapequa has not shown that it is similarly situated to Connetquot, which drew OCR's scrutiny by voluntarily discontinuing its challenge to Part 123 and taking affirmative steps to comply with the regulation. (*See* J.A. 433, 437.) Massapequa, by contrast, alleges that if it is required to comply with the regulation, that compliance will be unwilling. (*See* SPA 105.) The district court correctly concluded that, "[i]n such a posture, Massapequa has no legitimate basis to fear enforcement of Title VI against them." (*See* SPA 105.)

Moreover, "executive guidance and agency findings, in and of themselves, do not reflect settled law" and thus "cannot independently establish a likelihood that certain policies or conduct violate federal rights."[16] *Female Athletes United v. Ellison*, 172 F.4th 1019, 1029 (8th Cir. 2026); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024). And to defendants' knowledge, no federal agency has taken further action against Connetquot or NYSED following OCR's press releases about its investigation and findings. Thus, the record does not support Massapequa's

---

[16] Indeed, OCR previously took the opposite position, finding that a school district's failure to eliminate its Indigenous name and logo risked violating Title VI. (*See* J.A. 445-461.)

repeated contention that Title VI has been enforced against Connetquot. *See* Br. at 2-4, 10, 14, 19, 49.

Contrary to Massapequa's contention, the fact that Massapequa may face state consequences if it does not comply with Part 123 does not give it standing to assert a Title VI claim. *See id.* at 20-21, 23-24. Massapequa appears to argue that, because it is a regulated entity under Part 123, it has standing to vindicate the Title VI rights of third parties (such as school officers and employees) who allegedly would be subject to discrimination if Massapequa complies with Part 123. That argument fails for two reasons.

First, Massapequa's theory is at odds with the "prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 40 (2d Cir. 2015) (quotation marks omitted). That rule requires demonstrating "(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *Id.* at 41 (quotation marks omitted). Even if Massapequa could establish a close relationship with school employees or contractual counterparties, there is no barrier to those parties' asserting their own interests. Indeed, a school officer (Caramore) brought her own claims in

this case before deciding to dismiss them, and Massapequa's alleged contractual counterparty (NAGA) brought its own separate lawsuit. See *supra* at 11-12, 16 n.8.

Second, Massapequa does not plausibly allege that enforcement of Part 123 would result in the violation of third parties' rights. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Massapequa does not allege how eliminating the Chiefs name and logo would result in the discrimination against any "person" within the meaning of Title VI. *See* 42 U.S.C. § 2000d. And Massapequa's allegation that Part 123 discriminates against certain Indigenous school officers and employees by providing an exemption only for members of tribal nations ignores that this exemption contains a political, not racial, classification. *See Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974). In any event, the proposed complaint does not allege that any Indigenous school officer or employee intends to use the Chiefs logo or mascot on school property or at a school function. (*See* J.A. 173.) For these reasons, it is unsurprising that Massapequa focuses its argument instead on the supposed risk of federal enforcement. *See* Br. at 20-25.

### B. Massapequa Failed to Plausibly Allege Standing Based on Its Illusory Agreement with NAGA.

Massapequa attempts to rely on its Agreement with NAGA to support its standing to assert claims under Title VI, § 1981, the dormant Commerce Clause, and the Indian Commerce Clause. Br. at 24-32. The district court correctly held that the Agreement is illusory and unenforceable, and therefore its supposed impairment does not plausibly allege any cognizable injury in fact. *See Alliance for Hippocratic Med.*, 602 U.S. at 381 (injury in fact "must be real and not abstract"); *Fair Emp. Counsel of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1271 (D.C. Cir. 1994) (loss of opportunity to enter into unenforceable contract not a cognizable injury).

Under New York law, which governs the Agreement (NAGA Agreement at 3), an illusory contract is "[a]n agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation." *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684 (2017) (quotation marks omitted). An illusory promise cannot serve as consideration because "it would impose no obligation, since the promisor always has it within the promisor's power to keep the promise and yet escape performance of anything detrimental to itself or beneficial to the promisee." 3 Williston on Contracts § 7:7 (4th ed. Westlaw May 2025).

In other words, "where the promisor may perform or not, solely on the condition of whim, the promise will not serve as consideration." *Id.* And "where there is no consideration flowing from one party to a contract, . . . there is no contract." *Manufacturers Tr. Co. v. Kennedy*, 291 F.2d 460, 469 (2d Cir. 1961); *see Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 178 (2d Cir. 2006).

Here, both parties to the Agreement exchanged only illusory promises. On one side of the supposed bargain, NAGA purports to authorize Massapequa to use the Chiefs name and logo. NAGA Agreement at 2. But Massapequa does not allege that NAGA has any legal or proprietary right to the Chiefs name and logo. Indeed, Massapequa had already been using the Chiefs name and logo for decades before NAGA was founded in 2017. (*See* J.A. 139.) As the district court explained, NAGA's supposed authorization therefore "imposes no burden on NAGA, however measured, because the Chiefs mascot is not theirs to authorize, license, or convey." (SPA 53.) Thus, NAGA's promise is no more than "a gratuitous gesture without any legal effect." (SPA 53.)

On the other side of the supposed bargain, Massapequa promises to continue using the Chiefs name and logo and to continue providing the

district's preexisting educational programming. NAGA Agreement at 2. But Massapequa's performance under the Agreement is entirely optional. *See* Robert Braucher & E. Allan Farnsworth, A.L.I., *Restatement (Second) of Contracts* § 77 cmt. a (Westlaw Oct. 2024 update) ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."). For example, if Massapequa decides to stop using the Chiefs name and logo, NAGA's authorization to use the name and logo "will automatically be withdrawn" and no breach results. *See* NAGA Agreement at 2. (*See* SPA 54.) Moreover, if Massapequa decides to stop its educational programming, NAGA has "no cause of action of any kind and nature to compel or require the District to provide any kind of educational programing or instruction." NAGA Agreement at 2. (*See* SPA 54.) Indeed, nothing in the Agreement stops Massapequa from continuing to utilize the Chiefs name and logo without NAGA's consent. Massapequa's "unlimited right to decide later the nature or extent of [its] performance . . . in effect destroys the promise and makes it merely illusory." *See Chiapparelli v. Baker, Kellogg & Co.*, 252 N.Y. 192, 200 (1929).

On appeal, Massapequa barely attempts to identify any valid consideration on NAGA's side of the bargain, which alone is enough to

conclude that the Agreement is invalid. *See Manufacturers Tr. Co.*, 291 F.2d at 469. For example, Massapequa does not identify any legal interest that NAGA conveyed when it purported to provide "permission" and "support" for Massapequa's continued use of the Chiefs name and logo. While it is true that courts will hesitate to second-guess the value of consideration, *see Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464-65 (1982), a promise "must be of *some* value, or at least not merely empty formal words," *Nassau Supply Co. v. Ice Serv. Co.*, 252 N.Y. 277, 280 (1929) (emphasis added). But NAGA's purported authorization to use the Chiefs name and logo does not operate to confer any right or benefit to Massapequa, or result in any detriment or loss to NAGA, as required to constitute valid consideration.[17] *See Hamer v. Sidway*, 124 N.Y. 538, 545 (1891).

---

[17] Massapequa misplaces its reliance on cases holding that parties may enter into settlement agreements related to trademarks. *See* Br. at 41-42. Those cases involved licensing agreements in which licensees agreed not to challenge the validity of the licensor's intellectual property. *See Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 136 & n.6 (2d Cir. 2003) (discussing Massapequa's cited cases). Massapequa does not allege that NAGA owns any rights in the Chiefs name and logo and all but concedes that it has never needed NAGA's permission to use the name and logo. *See* Br. at 43.

Nor does the Agreement's annual meeting provision constitute valid consideration or otherwise demonstrate injury in fact, contrary to Massapequa's contention. *See* Br. at 41. For one, the Agreement imposes no obligation on NAGA to meet; rather, it is Massapequa that purportedly must "review and discuss" its educational programming with NAGA once annually. NAGA Agreement at 2. This supposed requirement is attendant to Massapequa's illusory promise to continue providing its existing educational programming, which Massapequa may discontinue at its sole option. In any event, Part 123 does not disturb any educational programming; it expressly preserves schools' ability to "utilize or display an Indigenous name, logo, or mascot . . . for purposes of classroom instruction." 8 N.Y.C.R.R. § 123.2.

Massapequa also fails to meaningfully dispute that the Agreement gives it a "blanket right to breach without consequence." *See* Br. at 44. Massapequa argues that "it would lose NAGA's support and education assistance" if it were to stop using the Chiefs name and logo. *Id.* But the Agreement says no such thing. If Massapequa stops using the Chiefs name and logo, NAGA withdraws its supposed "consent, support, and authorization" to use the name and logo. NAGA Agreement at 2.

Massapequa's continuing ability to consult with NAGA about its educational programming remains unaffected. *See id.* Thus, if NAGA were to choose to stop consulting with Massapequa, any resulting injury to Massapequa would not be traceable to Part 123 or redressable by judicial relief. *See Murthy v. Missouri*, 603 U.S. 43, 73 (2024); *Doe v. Hochul*, 139 F.4th 165, 187 (2d Cir. 2025).

Finally, Massapequa errs in arguing that the district court could not address the validity of the Agreement at the motion-to-dismiss stage. Br. at 40-41. The district court's ruling turned on the facts as alleged in the proposed complaint and the court's interpretation of the Agreement incorporated by reference in the proposed complaint. Contract interpretation is a question of law "suitable for disposition on a motion to dismiss." *See, e.g.*, *Even Street Prods., Ltd. v. Shkat Arrow Hafer & Weber, LLP*, 643 F. Supp. 2d 317, 324 (S.D.N.Y. 2008) (quotation marks omitted).

### C. Massapequa Failed to Plausibly Allege Standing Based on Any Other Purported Injury.

Finally, Massapequa attempts to rely on alleged compliance costs, legal exposure, and constitutional injury to support its standing. None of these theories has merit.

First, Massapequa's allegations about compliance costs are vague and speculative. *See Lacewell v. Office of Comptroller of Currency*, 999 F.3d 130, 143 n.14 (2d Cir. 2021). As the district court explained, the proposed complaint contains only passing references to compliance costs and does not explain "what financial or other costs are imposed to comply with Part 123." (SPA 46; *see* J.A. 154.) It does not, for instance, "identify the mascot's presence on school property, from which one could infer some 'cost' for removal." (SPA 46.) Massapequa's current assertion that it faces "replacement costs of around $1 million" (Br. at 23) appears nowhere in the proposed complaint.

In any event, Massapequa fails to explain how its supposed compliance costs are traceable to the legal violations it alleges. For example, even assuming that Massapequa were to incur costs related to replacing the Chiefs name and logo, those costs would be unrelated to Massapequa's claim that it will be forced to suppress the free speech rights of school

officers and employees. *See Keepers, Inc.*, 807 F.3d at 42-43. Nor would those costs arise from "an injury resulting from a burden on interstate commerce," *see MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 45 (2d Cir. 2017) (quotation marks omitted), or the regulation of tribal nations, *see Upstate Citizens for Equal., Inc. v. United States*, 841 F.3d 556, 565-66 (2d Cir. 2016), as required to establish standing under the dormant Commerce Clause and Indian Commerce Clause.[18] (*See* SPA 71-76.)

Second, Massapequa's allegation that it faces "legal exposure" does not support standing. Br. at 23. Massapequa argues that it risks legal exposure for breaching the NAGA Agreement and for engaging in unlawful discrimination. *Id.* at 35. But those allegations are inadequate because the NAGA Agreement is illusory and unenforceable (see *supra* at 37-42), and the proposed complaint fails to plausibly allege that Massapequa will be forced to violate Title VI (see *supra* at 36).

Third, the district court correctly rejected Massapequa's argument that it will be forced to chill free speech. Massapequa cannot rely on any

---

[18] Massapequa's attempt to rely on alleged reputational injury fails for the same reason. *See* Br. at 28-29.

injury to its own First Amendment interests to establish standing, because municipal entities lack enforceable First Amendment rights vis-à-vis the State. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009). Nor does Massapequa plausibly allege that it will be forced to infringe others' free speech. Massapequa's conclusory allegation that school "employees would be prohibited from wearing Chiefs apparel on school property" (Br. at 34) does not plausibly allege that any school official or employee plans to do so. *See Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.*, 11 F.4th 68, 76 (2d Cir. 2021). And because Caramore voluntarily dismissed all her claims (J.A. 423-424), Massapequa can no longer rely on Caramore's alleged plans to use the Chiefs mascot at school events or her allegations about other school officials and employees, *see Vermont Mobile Home Owners' Ass'n v. Lapierre*, 94 F. Supp. 2d 519, 526 (D. Vt. 2000). Besides, Massapequa does not allege that it intends to prevent Caramore from engaging in protected speech.[19] (*See* SPA 44-45.)

---

[19] Massapequa does not contest the district court's ruling that it lacks standing to "sue for the injuries of others" in relation to its political-speech claim (SPA 49) and has thus waived any challenge to that ruling, *see Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009).

Even assuming these allegations sufficed, they would establish Massapequa's standing to challenge only § 123.5, which governs the conduct of school officers and employees—not the entire regulatory scheme. *See Brokamp v. James*, 66 F.4th 374, 390 (2d Cir. 2023).

## POINT II

### THIS COURT MAY AFFIRM ON THE ALTERNATE GROUND THAT MASSAPEQUA LACKS CAPACITY TO CHALLENGE PART 123

Alternatively, this Court may affirm on the ground that Massapequa, as a municipal entity, lacks capacity to assert any of its claims against state officials. *See Beijing Neu Cloud Oriental Sys. Tech. Co. v. International Bus. Machs. Corp.*, 110 F.4th 106, 113 (2d Cir. 2024) (court may affirm on any ground supported by the record).

Federal Rule of Civil Procedure 17(b) provides that capacity is determined as a matter of state law. Under New York law, "municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." *City of New York v. New York*, 86 N.Y.2d 286, 289 (1995); *see Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 383 (2017) (*World Trade Ctr. II*). This capacity bar extends to school

districts, school boards, and officials acting on behalf of school districts or boards. *E.g.*, *City of New York*, 86 N.Y.2d at 290-91.

New York law recognizes four narrow exceptions to the capacity bar, *see id.* at 291-92, but only one exception is at issue here. Specifically, Massapequa relies on an exception that allows a municipal corporation to challenge the constitutionality of a state statute or regulation where the municipality's compliance with the state law would force the municipality to "violate a constitutional proscription." *See id.* at 292 (quotation marks omitted). And Massapequa attempts to invoke the constitutional-proscription exception in relation to only its First Amendment claims.[20] The district court correctly held that the exception does not apply here. The district court erred, however, when it found that Massapequa has capacity to assert its remaining claims based on an exception rooted in the Supremacy Clause that New York law does not recognize.

---

[20] Massapequa's capacity-related arguments concern only § 123.5. Massapequa does not contend that it has capacity to challenge any other aspect of Part 123 under the First Amendment.

### A. The District Court Correctly Ruled That Massapequa Lacks Capacity to Assert First Amendment Claims Against the State.

To qualify for the constitutional-proscription exception, a municipal corporation must demonstrate that, "if it is obliged to comply with the statute, that very compliance will force the corporation to violate a constitutional proscription." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 63-64 (2d Cir. 2017) (*World Trade Ctr. I*). And the municipal corporation must pinpoint the specific future conduct required by the challenged state law that would cause the corporation to violate the Constitution. *See Clarke v. Town of Newburgh*, No. 84, 2025 WL 3235042, at *4 (N.Y. Nov. 20, 2025); *Blakeman v. James*, No. 24-cv-1655, 2024 WL 3201671, at *14 (E.D.N.Y. Apr. 4, 2024). Facial challenges by municipalities are especially disfavored. *Clarke*, 2025 WL 3235042, at *3.

The district court correctly concluded that Massapequa lacks capacity to assert a First Amendment claim under the overbreadth doctrine. Massapequa's overbreadth claim centers on the allegation that § 123.5 will force it to participate in the "compelled suppression of speech." Br. at 38. Because "[a]ll overbreadth challenges are facial challenges," *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006), Massapequa must plausibly allege that its

enforcement of § 123.5 will force it to penalize a substantial amount of protected First Amendment activity relative to the regulation's plainly legitimate sweep, *see United States v. Williams*, 553 U.S. 285, 292 (2008); *see also Clarke*, 2025 WL 3235042, at *4 (to demonstrate capacity, municipality asserting facial challenge must show that state law in all applications would force municipality to take an unconstitutional act). Massapequa has not done so.

The proposed complaint alleges that Massapequa's employees will be "prohibited from wearing Chiefs apparel on school property." (J.A. 156.) But Massapequa makes no attempt to show that § 123.5 will force Massapequa to violate the First Amendment in a substantial number of its applications. The First Amendment does not prohibit public employers from restricting public employees' speech pursuant to their official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006). And school officers and employees necessarily are on duty during much, if not most, of the time that they are "located on school property or at a school function," 8 N.Y.C.R.R. § 123.5. Section 123.5 thus has a broad legitimate sweep, and Massapequa alleges no facts to suggest otherwise.

Although the proposed complaint alleges that Caramore intended to wear Chiefs apparel on school property for various purposes, she has since voluntarily dismissed her claims. As previously discussed (at 45), Massapequa may no longer rely on allegations supporting claims that were voluntarily withdrawn. In any event, Massapequa does not allege that a substantial amount of its future enforcement of § 123.5 will involve Caramore or similarly situated individuals who, for example, wish to use the Chiefs mascot at school functions to protest Part 123. As the district court observed, the proposed complaint contains little to no discussion of Massapequa's future enforcement of § 123.5. (SPA 29-30.) Because the nature of Massapequa's future enforcement of the regulation is purely speculative and presently unknown, Massapequa has not established its capacity to bring suit. *See Clarke*, 2025 WL 3235042, at *4.

Massapequa's claim based on the alleged suppression of future school board candidates' political speech fares no better. As the district court correctly concluded, "[t]he political speech claim lacks a single allegation as to how Massapequa . . . will be forced to participate in the violation of the political speech rights of the candidates for Board positions." (SPA 31.) And the proposed complaint does not allege that any candidate other than

Caramore (who has withdrawn her claims) intends to use the Chiefs name and logo on school property or at school functions for campaign purposes. (*See* J.A. 165-167.)

### B. Massapequa Lacks Capacity to Assert Its Other Statutory and Constitutional Claims.

Massapequa purports to bring its other constitutional and statutory claims under the Supremacy Clause. Br. at 24. But as the New York Court of Appeals recently clarified, the Supremacy Clause does not provide an exception to New York's capacity bar. *Clarke*, 2025 WL 3235042, at *4. Concluding otherwise, the court explained, "would authorize every local governmental entity to sue to challenge as unconstitutional any State legislation arguably affecting that subordinate entity." *Id.*

The district court was mistaken to hold that Massapequa has capacity to assert its preemption claims under this Court's decision in *Tong*, which did not involve the application of New York law about its municipalities' capacity. (*See* SPA 32.) Instead, *Tong* addressed whether principles of *federal* law prevent a political subdivision from asserting a federal preemption claim against its parent State. 930 F.3d at 72-73. Connecticut did not argue that the municipal plaintiff in *Tong* lacked capacity under its state

law. *See* Br. of Def.-Appellee at 71-77, *Tong*, 930 F.3d 65 (2d Cir. 2019) (No. 17-3481), ECF No. 129.

Although New York's capacity rule is "derived from" the same line of federal cases that *Tong* examined, the New York Court of Appeals has reserved for itself the authority to decide which principles of federal law to adopt as part of the State's capacity rule. *World Trade Ctr. II*, 30 N.Y.3d at 386 n.4. In *Clarke*, the court chose not to incorporate an exception rooted in the Supremacy Clause similar to the exception recognized in *Tong*.[21] *See* 2025 WL 3235042, at *4. This Court has held that state law governs a public corporation's capacity to sue the State, so the New York Court of Appeals' ruling on this question is determinative. *See World Trade Ctr. I*, 846 F.3d at 63-64, 70 (certifying question of public corporation's capacity to New York Court of Appeals); *see also* Fed. R. Civ. P. 17(b). (*See* J.A. 52-54 (collecting cases).)

Finally, although defendants did not initially challenge Massapequa's capacity to assert claims under the Supremacy Clause (*see* SPA 32), this

---

[21] Specifically, *Clarke* rejected the argument that because the state statute at issue allegedly violated the U.S. Constitution, "the Supremacy Clause overcomes New York's bar prohibiting its subordinate local governments from suing it." 2025 WL 3235042, at *4.

Court should nonetheless consider the defense on appeal for three reasons. First, the district court expressly ruled that Massapequa's claims asserted under the Supremacy Clause "fall under the *Tong* exception." (SPA 32.) And this Court "do[es] not consider arguments waived when, although not raised below, they were nevertheless passed on by the district court." *United States v. Young*, 998 F.3d 43, 52 n.2 (2d Cir. 2021) (quotation marks omitted). Second, the New York Court of Appeals' decision in *Clarke* was issued *after* the district court's decision in this case.[22] A party does not waive a defense or objection where "a controlling case . . . was subsequently decided." *Stubbs v. Smith*, 533 F.2d 64, 69 (2d Cir. 1976). Third, the question of Massapequa's legal capacity "presents a question of law and there is no need for additional fact-finding." *See Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 208 n.11 (2d Cir. 2012).

---

[22] Defendants raised the defense in response to Massapequa's motion for reconsideration, by which time *Clarke* had been decided. (*See* Mem. of Law in Opp'n to Mot. to Alter or Amend Judgment at 9-10 (Feb. 9, 2026), ECF No. 92.)

## POINT III

### THIS COURT MAY AFFIRM ON THE ALTERNATE GROUND THAT THE PROPOSED COMPLAINT FAILS TO STATE A CLAIM

If, contrary to the principles above, this Court determines that Massapequa has both standing and capacity, it should nonetheless affirm on the ground that the proposed complaint fails to state a claim.[23]

### A. The Proposed Complaint Fails to State a Title VI Claim.

Massapequa fails to state a Title VI claim for two reasons. First, as a municipal entity, Massapequa has no private right of action to sue the State under Title VI. Second, Massapequa does not plausibly allege that Part 123 conflicts with Title VI and is thus preempted.

---

[23] In opposition to Massapequa's motion for leave to amend, defendants argued that the First Amendment claim would be futile based on Massapequa's lack of standing and capacity—not for failure to state a claim. But the proposed complaint fails to state a First Amendment claim for the same reason that Massapequa lacks capacity: there is no plausible allegation that Massapequa will be required to violate the First Amendment. See *supra* at 48-51.

**1. Massapequa lacks a private right of action under Title VI.**

To determine whether a statute provides a private right of action,[24] courts must "determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). While the Supreme Court has recognized an implied right of action for private individuals to enforce Title VI's prohibition against intentional discrimination, *id.* at 279-80, "[n]othing in Title VI or its legislative history suggests that Congress conceived of a state instrumentality as a 'person' with rights under this statute," *United States v. Alabama*, 791 F.2d 1450, 1456 (11th Cir. 1986). Considering that "Title VI provides for a comprehensive scheme of administrative enforcement, and the Supreme Court has implicitly recognized a private right of action for individuals injured by a Title VI violation," there is no basis to extend an implied right of action to political subdivisions suing the State. *Id.*; *see DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 689 (11th Cir. 1997);

[24] Defendants argued below that Massapequa lacks "statutory standing," but that concept is better framed as "whether the particular plaintiff has a cause of action under the statute." *See American Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quotation marks omitted).

*Stanley v. Darlington Cnty. Sch. Dist.*, 84 F.3d 707, 717 n.2 (4th Cir. 1996); U.S. Dep't of Just., *Title VI Legal Manual*, pt. V, § A, 2017 WL 1712115 (2017) (Westlaw).

Nor may Massapequa attempt to rely on the Supremacy Clause for a private right of action. "[T]he Supremacy Clause is not the source of any federal rights . . . and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) (quotation marks omitted).

**2. Massapequa fails to plausibly allege that Part 123 conflicts with Title VI.**

Separately, Massapequa fails to plausibly allege that Part 123 directly conflicts with Title VI and is thus preempted. Such a conflict is necessary to establish either impossibility or obstacle preemption, which Massapequa attempts to invoke here (Br. at 20 n.3). *See In re Methyl Tertiary Butyl (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 97, 101-02 (2d Cir. 2013). A Title VI violation based on intentional discrimination (for which there exists an implied private right of action) occurs when a program or activity receiving federal financial assistance intentionally discriminates against an individual and "the discrimination was a substantial or motivating

factor for the defendant's actions." *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (quotation marks omitted). Massapequa fails to plausibly allege any such discrimination under the three theories presented in the proposed complaint. *See* Br. at 24.

First, Part 123's requirement that public school districts eliminate Indigenous names, logos, and mascots for certain purposes does not exclude any person from participation in a program, deny any person the benefits of that program, or discriminate against any person. *See* 40 U.S.C. § 2000d. Part 123 merely restricts the use of certain mascots to represent school sports teams and similar entities. *See* 8 N.Y.C.R.R. §§ 123.1-123.2.

But even assuming arguendo that § 123.1's definition of "Indigenous name, logo, or mascot" imposes a racial classification, Part 123 would satisfy strict scrutiny because it furthers a compelling state interest and is "narrowly tailored to accomplish the purpose." *See Pyke v. Cuomo*, 567 F.3d 74, 77 (2d Cir. 2009). NYSED has a compelling state interest in ensuring a learning environment for all students that is free from disruption, discrimination, and harassment. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 593-94 (1983). And it also has a compelling interest in ending the harmful practice of perpetuating racial stereotypes through public

schools' use of Indigenous names, logos, and mascots to represent, for example, sports teams. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023) (confirming compelling interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute").

To that end, New York law prohibits "the creation of a hostile environment . . . that reasonably causes or would reasonably be expected to cause . . . emotional harm to a student." Educ. Law § 11(7). NYSED reasonably concluded that the continued use of Indigenous names, logos, and mascots would violate that law, particularly after a state court upheld the Commissioner's ruling to that effect in the *Cambridge* case. And for more than two decades, NYSED has maintained that the use of Indigenous names, logos, and mascots is detrimental to school communities and students' academic achievement. In reaching this conclusion, NYSED relied on a wealth of academic research and consultation with Indigenous communities and residents across the State. See *supra* at 5-7.

Part 123 is also narrowly tailored to accomplish its purpose. Part 123 applies only to public schools and prohibits their use of Indigenous names, logos, or mascots for a specific purpose: to represent the school in school

sports or similar activities. 8 N.Y.C.R.R. §§ 123.1-123.2. Part 123 allows the use of such names, logos, or mascots "for purposes of classroom instruction." *Id.* § 123.2. And public schools may continue to use Indigenous, names, logos, and mascots with the consent of an associated tribal nation. *Id.* § 123.4(b). Part 123 imposes no restriction on the public at large, and instead narrowly limits the ability of public school officers and employees to use and promote Indigenous names, logos, or mascots on school property or at school functions. *See id.* § 123.5.

Second, Part 123 does not "bar[] agreements with Indigenous individuals and organizations," while permitting similar agreements with non-Indigenous counterparties, as Massapequa erroneously argues (Br. at 24). Section 123.4(b) confers on tribal nations the ability to consent to a public school's use of an Indigenous name, logo, or mascot that is culturally affiliated with that tribe. 8 N.Y.C.R.R. § 123.4(b). Public schools must have obtained that consent prior to Part 123's effective date. *Id.* Part 123 does not speak to the ability of school districts to enter into contracts or licensing agreements concerning names, logos, or mascots once they have obtained that initial consent. And if a public school fails to obtain such consent, it may not use an Indigenous name, logo, or mascot regardless

of the cultural affiliation of the licensor. In other words, the consent provision does not prevent public schools from contracting with any individual or organization based on their race or cultural affiliation but rather governs the circumstances in which a public school may use an Indigenous name, logo, or mascot. And contrary to Massapequa's allegations (J.A. 170), the fact that only tribal nations may provide consent under § 123.4(b) imposes a political rather than a race-based classification, *see Mancari*, 417 U.S. at 553 n.24.

Third, Part 123's exemption for a member of a tribal nation who "is utilizing or promoting an Indigenous name, logo, or mascot of such tribal nation" also imposes a political classification. *See* 8 N.Y.C.R.R. § 123.5.

### B. The Proposed Complaint Fails to State a 42 U.S.C. § 1981 Claim.

Massapequa similarly fails to state a preemption claim under § 1981, which "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship." *See Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004); *see also Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000).

As a preliminary matter, Massapequa does not allege that it is a racial minority protected under § 1981. *See Brown*, 221 F.3d at 339. Nor does it attempt to establish that it has prudential standing to assert the rights of contractual counterparties (such as NAGA), who would face no obstacle to asserting their own claims. See *supra* at 35-36. The § 1981 claim fails on this basis alone.

Moreover, "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship' under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (quoting 42 U.S.C. § 1981(b)). As previously demonstrated (at 37-42), Massapequa has no rights under its illusory Agreement with NAGA. The lack of any valid contractual relationship that could be impaired independently disposes of Massapequa's § 1981 claim.

Massapequa appears to argue that § 123.4(b) impairs contractual relationships because it allegedly bars "new contracts with Indigenous tribes and bars any money, consideration, or thing of value in pre-May 3, 2023 tribal agreements." *See* Br. at 25 (quotation marks omitted). But as explained (at 59-60), these rules govern the manner in which public schools may obtain a tribal nation's consent to use an Indigenous name, logo, or mascot, and do not plausibly implicate the right to contract.

Massapequa also fails to plausibly allege that § 123.4(b) intentionally discriminates based on race. *See Brown*, 221 F.3d at 339. To the extent Massapequa argues that only federally or state-recognized tribal nations may consent to public schools' use of an Indigenous name, logo, or mascot, that classification is political, not racial. *See Mancari*, 417 U.S. at 553 n.24. And Massapequa does not plausibly allege that Part 123 was motivated by anything other than the desire to eliminate racial discrimination and stereotyping in public schools. *See Spirit Lake Tribe of Indians ex rel. Comm. of Understanding & Respect v. NCAA*, 715 F.3d 1089, 1092-93 (8th Cir. 2013) (plaintiffs failed to plausibly allege § 1981 claim against NCAA based on policy designed to "eliminate the use of 'hostile and abusive' mascots and imagery").

## C. The Proposed Complaint Fails to State a Dormant Commerce Clause Claim.

The proposed complaint does not plausibly allege that Part 123 violates the dormant Commerce Clause. "[T]he Commerce Clause prohibits the enforcement of state laws driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quotation marks omitted); *see Selevan v. New York Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009).

Here, Massapequa does not plausibly allege a competitive market for Indigenous names, logos, or mascots used to represent public schools, nor does it identify any relevant in-state or out-of-state commercial interests affected by Part 123. According to Massapequa, Part 123 favors the interests of in-state tribal nations over out-of-state tribal nations because § 123.4(b)'s tribal-consent provision extends only to tribal nations within New York State. (J.A. 179-180.) But tribal nations that provide consent under Part 123 do not receive "any money, consideration, or thing of value." 8 N.Y.C.R.R. § 123.4(b). It follows that Part 123 does not favor any "in-state *commercial* interest." *See Selevan*, 584 F.3d at 95 (emphasis added).

Nor does Massapequa identify any out-of-state commercial interests at issue. For example, Massapequa's name and logo are in the public domain and purportedly reference a historical, local tribal leader. (*See* SPA 18; J.A. 139-140.) And NAGA itself is not a tribal nation, so Massapequa's argument that out-of-state tribal nations may not provide consent under § 123.4(b) is irrelevant. *See* Br. at 28. Because Massapequa fails to allege that Part 123 implicates a competitive market, it cannot state a claim under the dormant Commerce Clause. *See General Motors Corp. v. Tracy*, 519 U.S. 278, 300 (1997).

### D. The Proposed Complaint Fails to State an Indian Commerce Clause Claim.

The proposed complaint does not plausibly allege that Part 123 violates the Indian Commerce Clause. Under that clause, "Congress shall have Power . . . [t]o regulate Commerce . . . with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. In assessing claims under the Indian Commerce Clause, this Court considers "the location of the targeted conduct and the citizenship of the participants in that activity." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 113 (2d Cir. 2014). Generally, "the Indian Commerce Clause's grant of authority to the

federal government, and preemption of state authority, extends only to activities occurring in 'Indian country,' i.e., Indian lands within the territory of the United States." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 173 (2d Cir. 2005).

Massapequa does not plausibly allege that Part 123 implicates activities on Indian lands or affects Indian affairs. Part 123 regulates public schools and expressly excludes tribal nations from its scope. *See* 8 N.Y.C.R.R. §§ 123.2, 123.4(a). The tribal-consent provision does not regulate Indian commerce or affairs but rather confers on tribal nations the ability to consent to the use of Indigenous names, logos, or mascots by public schools located outside of tribal lands. *See id.* § 123.4(b). The provision's restriction on offering or accepting money or other consideration for a tribal nation's authorization operates only on public schools. *See id.* § 123.4(b). The restriction does not operate as a bar on contracting with "tribal-affiliated groups," as Massapequa suggests (Br. at 31-32), but rather governs the terms on which tribal nations may provide their consent under the regulatory scheme. And a tribe otherwise has "no legitimate interest in selling an opportunity to evade state law." *Otoe-Missouria Tribe of Indians*, 769 F.3d at 114.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: New York, New York
May 13, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellees

By: */s/ Stephen J. Yanni*
STEPHEN J. YANNI
Assistant Solicitor General

28 Liberty Street
New York, New York 10005
(212) 416-6184

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
STEPHEN J. YANNI
*Assistant Solicitor General*
*of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Mary Quinn Moss, an employee in the Office of the New York State Attorney General, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 12,716 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Mary Quinn Moss*